# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

**PATRICK NEALIS,**

    **Plaintiff,**

**v.**                       **CASE No. 3:23-00623**

**PGA TOUR, INC.,**          **JURY TRIAL DEMANDED**

    **Defendant.**

_____/

## <u>AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Patrick Nealis ("Mr. Nealis") makes the following allegations of discrimination and retaliation for his complaint against Defendant PGA Tour, Inc. ("Defendant PGA Tour").

## INTRODUCTION

1.    In August 2007, Plaintiff Patrick Nealis landed his dream job working for the PGA Tour as part of its Productions (Entertainment) Department. Mr. Nealis, as a recent college graduate and a Christian, assumed that the PGA Tour welcomed his views into its work environment. Mr. Nealis looked forward to a long future at the PGA Tour.

2.    When the pandemic hit, the PGA Tour closed its office doors and forced its employees, including Mr. Nealis, to work from home for over one year before it conducted voluntary returns to the office.

3.     Under the façade of unity and teamwork, Defendant PGA Tour required all of its employees to report their vaccination status, and, if unvaccinated – even if granted a religious or medical exemption – to follow an increasingly burdensome regime of testing, reporting, social distancing, and masking.

4.     Beginning November 1, 2021, all unvaccinated PGA Tour employees had to "comply with new safety protocols" (the "Safety Protocols"). Although the PGA Tour had congratulated itself for working safely during the first nineteen months of the pandemic without requiring its employees to test and report their Covid status, the PGA Tour implemented testing and reporting requirements – and only for unvaccinated employees.

5.     The Safety Protocols were extremely burdensome and time-consuming, designed to frustrate and thereby compel compliance. The Safety Protocols also appeared to be contrived to "out" the "unvaccinated" in a climate where the President of the United States had declared on national television that "many of us are frustrated with the nearly 80 million Americans who are still unvaccinated" and that "our patience is wearing thin."

6.     Defendant PGA Tour granted accommodations from full compliance with the Safety Protocols to employees who secured medical exemptions but not to employees who had secured religious exemptions.

7.     In addition, the only religious "exemption" that the PGA Tour actually

2

supplied did not make sense and was thus suspect. Mr. Nealis was "exempt" from paying an additional $100.00 of medical insurance premium per month. But, of course, the amount he had to pay for medical insurance was not an aspect of his religious beliefs nor had he requested an exemption from the new monetary requirement which was charged to unvaccinated employees.

8.     PGA Tour regarded unvaccinated employees, such as Mr. Nealis, as being permanent physical transmitters of Covid-19 and thus a continuing risk to the health and safety of the workplace.

9.     Based on the PGA Tour's discriminatory implementation of its Safety Protocols, its juxtaposition of Mr. Nealis's request for a "religious exemption" with a "reduction" of a newly-imposed premium increase, and the denial of his request for exemption from PGA Tour's shifting and onerous masking and testing requirements, Mr. Nealis is asserting his claims of religious discrimination, disability discrimination, and retaliation pursuant to Title VII, the ADA, and the FCRA.

10.     Defendant regarded Mr. Nealis as disabled and terminated him because of his perceived disability, and then subsequently retaliated against Mr. Nealis for raising religious objections to the Covid-19 vaccine and protocols.

JURISDICTION AND VENUE

11.     Mr. Nealis has fulfilled the jurisdictional requirements of Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Americans with Disabilities Act of 1990 ("ADA"), including filing a charge of discrimination and retaliation with the Florida

3

Commission on Human Relations, which was dual-filed with the Equal Employment Opportunity Commission ("EEOC"). Mr. Nealis received a right to sue letter from the EEOC on February 27, 2023, all in compliance with 42 U.S.C. § 2000e-5(f)(1). The EEOC right to sue letter was previously filed with the Court.

12.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Mr. Nealis asserts claims arising under federal statute. This Court further has supplemental jurisdiction over Mr. Nealis's state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court maintains personal jurisdiction over Defendant PGA Tour because Defendant's contacts with Florida and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice.

14.     Defendant PGA Tour is subject to the provisions of Title VII and the ADA because Defendant PGA Tour is engaged in commerce and employs more than fifteen employees in each of twenty or more calendar weeks in the current or preceding calendar year under 42 U.S.C. § 2000e(b).

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1-2) because Defendant PGA Tour conducts business in this judicial district and a substantial part of the acts and omissions giving rise to the claims set forth herein occurred in this judicial district.

## PARTIES

16.     Plaintiff Patrick Nealis is a former employee of Defendant PGA Tour

and resides in Jacksonville, Florida.

17.     Defendant PGA Tour is a Maryland Not For Profit Corporation and has Global Headquarters located at 1 PGA Tour Blvd., Ponte Vedra Beach, Florida.

18.     Mr. Nealis worked at PGA Tour's Global Headquarters located in Ponte Vedra Beach, Florida.

## FACTS

Mr. Nealis was a "Senior Manager, Business Intelligence" on the Data Analytics Team in the Data & Technology Solutions Department

19.     In 2007, Mr. Nealis began his career as a "Duplicator" for the PGA Tour. As a recent graduate of the University of Florida College of Journalism and Communications, his collegiate experience enabled him to excel in his position as well as supporting many other Entertainment teams above and beyond his hired responsibilities. In recognition of this excellence, he was nominated for the PGA Tour's company-wide Merit Award during the Fourth Quarter of 2011.

20.     While employed at the PGA Tour, Mr. Nealis earned his MBA from the University of Florida. With this additional degree in hand, Mr. Nealis was awarded the position of "Strategic Development Analyst" in the PGA Tour's Digital Media Department.

21.     Mr. Nealis was particularly well-suited for his new role with the PGA Tour, which required establishing new business affairs level management processes across PGA Tour departments. The PGA Tour trusted Mr. Nealis to perform this task, providing him wide latitude to work independently and creatively with minimal

oversight or direction. His job responsibilities included managing the Digital Media Team's budgets, forecasting, spending, vendor contracts, and various other financial and legal support responsibilities as assigned.

22.    Mr. Nealis was extremely dedicated to the PGA Tour, frequently working long hours and through weekends during his personal time. He took pride in his work and was a proud ambassador of the PGA Tour at public events and through his community involvement, such as being a member of his alma mater's alumni advisory board.

23.    Mr. Nealis's track record for excellence at the PGA Tour was reflected in his performance evaluations. In 2015, he was recognized by the PGA Tour's Commissioner as the Third Quarter company-wide Merit Award Winner. In response to the excellence he exhibited within his responsibilities, he was promoted to "Manager" and then "Senior Manager." He was also selected by Senior PGA Tour leadership for the 2017 Manager Development Series training program and the 2018 Leadership Insight Series training program.

24.    In March of 2021, after a full year working remotely during a nationwide pandemic, Mr. Nealis was awarded a near maximum performance evaluation (23% on a scale of 9% - 24%) as well as transferred onto the Data Science and Technology group in June 2021 as a Senior Manager, Business Intelligence. Mr. Nealis held this position until he was terminated in November 2021.

25.    Mr. Nealis was paid a base salary by Defendant PGA Tour and was eligible for performance bonuses. Defendant PGA Tour also provided a pension.

### Defendant PGA Tour Closes Its Doors and Requires All Employees to Work from Home for Over a Year

26.   PGA Tour Headquarters closed its doors in March 2020 and required its employees to work from home, but Mr. Nealis's dedication to the PGA Tour continued.

27.   In May 2021, Defendant hosted a voluntary return to work period where employees, regardless of vaccination status, were encouraged to perform their work duties at the office. The PGA Tour had just completed construction of a new office building – the "global home" – and was anxious to fill it with "safe" employees.

28.   During this voluntary phase, the PGA Tour operated under its TOP 10 Covid Health and Safety Protocols, supported by multiple facility mitigation measures, which served as the PGA Tour's primary Pandemic Health and Safety response. This remained in effect through November 1, 2021. These did not include the Incremental Health and Safety Protocols for Unvaccinated Employees.

29.   Mr. Nealis came into the office several times during the "soft" opening, as he desired to work back at the office.

30.   PGA Tour communicated twice that employees, including Mr. Nealis who worked in the office during this soft opening, "successfully demonstrated how to work in a pandemic environment safely and effectively" prior to any additional health and safety protocols taking affect. The PGA Tour credited its overall vaccination percentage, improvement of local transmission numbers, in-office flexible space

options, state of the art circulation systems, and employees being respectful of one another as the reasons the PGA Tour decided to finally re-open the office.

31.     Defendant PGA Tour sent communications with dates for the "hard" opening. Initially it was June 1, 2021, but the date kept being moved back as new strains of Covid-19 reportedly circulated. Finally, when the PGA Tour apparently believed that threats of new strains of Covid-19 had dissipated – or that it would be successful in compelling all employees to get vaccinated – the hard opening was set for November 1, 2021.

Defendant Imposed Covid-19 Policies that Effectively Mandated the Vaccine

32.     On May 20, 2021, Defendant emphasized the "TOUR does not require proof of vaccination; we trust our employees to abide by the honor system. Managers and co-workers should not ask one another about their vaccination status as a matter of personal privacy."

33.     The PGA Tour determined that vaccination status was crucial for employees' return to the office.

34.     In an August 6, 2021, email from Human Resources, the PGA Tour stated that in order to "continue to provide a safe work environment" for its employees, it was necessary "to understand the number of employees who are fully vaccinated or will be in the immediate future."

35.     Abandoning its earlier "honor system," the email instructed employees to upload proof of their vaccination status. For an employee "not yet fully vaccinated," the email instructed the employee to fill out a survey "stating when you intend to get

8

the vaccine or that you did not plan to get the vaccine." Mr. Nealis provided his vaccination status under the implied agreement of personal privacy of his medical information which the PGA Tour had previously provided.

36.     In a follow up email on August 17, 2021, Commissioner Jay Monahan stated he was "very pleased to report that 98 percent of our employees have responded to the request that all U.S.-based employees report their vaccination status."

37.     Commissioner Monahan was "even more pleased to share that 87 percent of our employees are either fully vaccinated or in the middle of the vaccination process, with completion date occurring by October 1."

38.     Monahan continued: "Suffice it to say, 87 percent is impressive and encouraging. I want to take a moment to celebrate and thank everyone who has made this choice. When you think about it, this effort reinforces what is best about our culture – how we respect each other, our honesty and integrity and how we care about the communities where we play."

39.     Commissioner Monahan took a different tone addressing "those employees who have chosen not to be vaccinated" – they would soon be contacted "regarding additional steps that will need to be taken to mitigate risk and ensure the health and safety of all."

40.     Thus, the PGA Tour's message was loud and clear: employees who wanted to be classed with the "team players" were vaccinated. Those who did not were regarded by the Commissioner as being disrespectful and not acting with integrity or showing care to the community. Instead, they were a risk that had to be mitigated.

41.    The only real mitigation that would satisfy Defendant PGA Tour was communicated in an email to Mr. Nealis from Human Resources, Michelle Corse, on August 31, 2021. The email implied that employees who would not submit to "full vaccination" were not acting "in a socially responsible manner." Then it directly addressed Mr. Nealis: "Our records indicated that you have chosen not to get vaccinated against Covid-19." The email then stated, like a mandate, that all employees who decided not to get the vaccine for a religious or medical reason must complete a religious or medical "Covid-19 Vaccination Request for Exemption."

42.    The email informed Mr. Nealis that "Beginning October 1, any employee not fully vaccinated will be required to comply with new safety protocols, regardless of whether a medical or religious exemption has been granted. This will include a weekly Covid-19 test and other requirements to be determined."

43.    The email concluded, "Employees who fail to follow all established protocols under our new policy will be out of compliance which may result in disciplinary measures up to and including separation of employment."

44.    On October 25, 2021, the PGA Tour notified all employees that it had decided to share employees' vaccination status with department managers – a decision made in complete contradiction to the commitment to personal privacy the PGA Tour had previously promised when it collected vaccination status information.

Plaintiff Patrick Nealis submitted his request for religious exemption

45.    Mr. Nealis is a Christian who believes he has a responsibility to guard what he puts into his body, as it is a temple of the Holy Spirit. He is religiously

compelled to reject the intrusion of any medical intervention that is designed to coerce individuals to operate in a manner inconsistent with Biblical principles, especially an intrusion that is potentially harmful to the body. Mr. Nealis also raised religious objections to the weekly, intrusive nasal Covid tests.

46.     Because of his strongly held religious beliefs and deeply held moral convictions against taking the Covid-19 vaccine, Mr. Nealis requested a religious exemption from Defendant PGA Tour's Covid-19 Policies. Defendant PGA Tour tried to misrepresent his intention on multiple occasions, including that he submitted his religious exemption "to avoid financial penalties."

47.     Mr. Nealis first officially raised his concern in a meeting with his department leader discussing whether or not he should submit a religious exemption. During that meeting, the department leader shared that he had a family member in the hospital in critical condition without access to life supporting measures such as equipment, supplies, and support staff "because of unvaccinated individuals." Shortly after that meeting, that family member passed away.

48.     The implication that Mr. Nealis, as an unvaccinated individual, somehow contributed to the heartbreaking loss of the department leader's loved one was extremely distressing to Mr. Nealis; that the statement was even made can be understood as a logical result of PGA Tour's insistence – which it drilled into its senior leadership team in addition to all employees – that unvaccinated persons were the problem that had to be mitigated.

49.     Mr. Nealis had serious reservations about submitting a religious exemption because he feared retaliation and hostility. However, after learning about the religious protection provided by Title VII, that other employees had also sought religious exemptions and were willing to put everything on the line, and that some employees had already resigned because of their religious objections to Defendant's discriminatory Covid policies, he felt empowered to submit his religious exemption.

50.     The PGA Tour forced him to articulate his beliefs during a virtual meeting – that felt more like an interrogation – with a company lawyer: the Deputy General Counsel/ Executive Vice President, Social Responsibility & Inclusion. The Deputy General Counsel was also a leading member of the PGA Tour's Inclusion Leadership Council.

51.     After the meeting, the PGA Tour granted Mr. Nealis's request for religious exemption, re-asserting specifically that the exemption did not include relief from the newly created, incremental health and safety protocols for unvaccinated employees, which included severely burdensome masking and weekly testing requirements.

## PGA Tour's Selective Diversity Commitments

52.     In 2017, under the leadership of Commissioner Jay Monahan, the PGA Tour initiated an "Action for Diversity and Inclusion," pledging to "actively cultivate a workplace where diverse perspectives are welcomed and respected, where employees feel encouraged to discuss diversity and inclusion."

53. In 2020, in reference to the PGA Tour's Inclusion Leadership Council, the commissioner reiterated his pledge that "We are not just checking boxes here. Diversity, equity and inclusion MUST be woven into the fabric of our organization. I concede this is not an easy task and it will require all of us to participate, fully."

54. The Commissioner specifically identified that he along with the Inclusion Leadership Council's leaned on "other passionate employees" to help the PGA Tour be more inclusive by identifying impacted team members and giving them a prominent voice.

55. PGA Tour purported to value its employees and to promote diversity within and among its employees, "encouraging" all employees in May 2021 to sign the "PGA Tour Global Pledge to Inclusion," noting that the "Executive Leadership Team has already signed the pledge."

56. The pledge insisted that "inclusion of people from diverse backgrounds," including national origin and religion, were a "paramount priority of the PGA Tour."

57. Employees pledged to "actively promote acceptance and respect" and to "embrace differences and commonalities." But actions speak louder than words, and Mr. Nealis would soon realize that his views and beliefs would be pushed out by Defendant PGA Tour rather than respected.

58. In 2021, the Tour refused to give "impacted team members" a "prominent voice" – or any voice – when the issue was Covid-19 vaccinations.

59. A review of the PGA Tour's 2020 "Diversity and Inclusion Response," compared with its 2021 response, is revealing.

13

60.     In 2020, the TOUR's Diversity and Inclusion response included multiple measures focusing on employees who were "impacted":

    a.  Inclusion Leadership Council providing a voice to those impacted

    b.  Employee Resource Groups provide support for those impacted

    c.  External resources provided as advocates for those impacted

    d.  Empowering "passionate" impacted employees to support impacted

    e.  Commissioner as Personal Ambassador for those impacted

61.     In 2021, the PGA Tour's Diversity and Inclusion response was drastically different. Not only did the response exclude each of the 2020 measures; the response attacked the impacted employees as follows:

    f.  Inclusion leadership council denied impacted person the opportunity to share their experiences and request support. The Inclusion Leadership Council's executive leadership members were the chief accusers operating in opposition to those impacted.

    g.  Multiple requests for Employee Resource Groups to support those impacted were disregarded.

    h.  The only external resource (a medical consultant) provided by the PGA Tour was not there to give balanced or helpful medical advice (and even the fact that there was a medical advisor is problematic, as an employer – especially not a sports entertainment company! – should not be providing medical care or advice) but instead to persuade employees to get

14

vaccinated. The PGA Tour did not offer a single resource to advocate on behalf of unvaccinated.

62.     Passionate employees were isolated in their homes and silenced, and many were retaliated against for speaking up. One such employee was scolded by the PGA Tour in an email from the Senior Vice President Representative of HR to "MAKE THIS STOP, THESE ARE OUR POLICIES, PERIOD."

63.     The Commissioner deliberately ignored multiple requests for his advocacy from those impacted, in direct contradiction of his pledged commitment to do so.

64.     On October 27, 2021, Mr. Nealis notified the PGA Tour that he believed its actions were discriminatory in nature. The PGA Tour initially dismissed this assertion by committing to schedule a discussion that never occurred. On November 1, 2021, Mr. Nealis reiterated his concern. PGA Tour dismissively responded with an incorrect statement of the law: that the policy from which he requested an accommodation was a "neutral policy" and thus could not be discriminatory. Not only was this legally incorrect, the policy was not neutral. The incremental health and safety protocols were not applied to 87% of Defendant's employee base. The protocols, however, applied to all religious employees who sought accommodation from the Covid-19 vaccination.

65.     On November 9, 2021, the PGA Tour's executive officer for Diversity and Inclusion responded that "Inclusion is not about letting someone avoid application of neutral policies when they don't agree with them, especially when the

15

health and safety of others are involved….Many other unvaccinated individuals, regardless of their religious status or beliefs, are following these protocols without any issue. We hope you will follow their lead."

66.     Not only was this statement in itself discriminatory by suggesting Mr. Nealis should follow the lead of employees who did not share his beliefs; the statement was also deliberately inaccurate. Mr. Nealis was well-informed of the known contingent of religious employees who had also been granted PGA Tour's nominal exemption. Those employees had shared their concerns with following these protocols and that they had also reported the protocols to HR as discriminatory.

67.     This statement also revealed that the PGA Tour was giving preference to the "fears" of vaccinated employees regarding getting Covid-19 over the "fears" of religious employees regarding violating their religious beliefs.

The PGA Tour's Requirements Were Burdensome and Pointless

68.     The so-called religious "exemption" came with penalties; it became even more apparent that although the PGA Tour did not label its expectation a "mandate," that is what it was. Anyone who received a religious exemption was told their decision was "respected" but then became subject to a litany of requirements.

69.     Michelle Corse of Human Resources sent an email to Mr. Nealis on October 15, 2021, explaining that should Mr. Nealis continue to abstain from Covid-19 vaccination, he must upload his first test result by noon on Friday, October 29, 2021.

16

70.     Not only was Mr. Nealis required to upload a test every subsequent Friday at noon, receiving the tests was complicated, as was taking the test.

71.     The only Tour-approved testing product included in the "Safety Protocols" for the unvaccinated was the Abbott Labs (eMed) BinaxNow COVID-19 home Nasal Swab test. The test required kits be purchased online, mailed home through a severely supply-chain restricted US Mail network, and administered virtually through teleconference with a medical professional for nearly instant results. The PGA Tour was aware of the supply constraints for this product, as the day the product was announced by HR, the manufacturer reported some packages were already out of stock. The kits Mr. Nealis was able to purchase had already expired, with a notice of emergency use extension provided prominently on the packaging.

72.     The PGA Tour expressly provided no other testing alternative was permitted, prohibiting employees to test at local certified health facilities and clinics by medically accredited physicians.

73.     When the PGA Tour "approved" Mr. Nealis' religious exemption, it attempted to represent that it was providing him an accommodation by way of a single alternative product, the "1health saliva testing kit." Not only was this option forcing him to schedule a weekly test in front of a doctor on Zoom, which would have been humiliating and uncomfortable by requiring him to produce saliva into a cup, the samples had to be mailed to the laboratory through that same significantly constrained U.S. Mail network. Even setting aside shipping delays, the results received from the laboratory required up to 72 hours to process before he could email the result to the

17

PGA Tour by the deadline of every Friday at noon. The days required to generate a test result made it impossible to provide the results by the deadline. Then a cycle would start up all over again the next week.

74.   The Zoom-administered tests would have burdened Mr. Nealis with unnecessary stress while trying to balance several time sensitive steps in order to meet a very strict deadline, which was not a reasonable accommodation and rather was designed to compel him into compliance with submitting to the vaccine or to separate from the PGA Tour "voluntarily."

75.   The PGA Tour-approved saliva test also required the disclosure of eight invasive categories of Mr. Nealis' personal health and genetic information to unknown third parties. When requesting relief from this burden, Defendant ignored his concerns and instead informed him they had completed a privacy analysis of a completely different (and thus, irrelevant) test.

76.   Defendant PGA Tour denied Mr. Nealis's request to forgo the weekly tests and take a confidential instant saliva test alternative – or to simply avoid the nonsensical hassle and obstacles and just continue working from home as he had been for eighteen months until Defendant PGA Tour decided he was no longer a "dangerous" Covid-19 transmitter.

77.   PGA Tour required that Mr. Nealis comply with these measures even though there was no evidence or actual data that unvaccinated persons were more likely than vaccinated persons to transmit Covid-19 and even though the other

employees would potentially be exposed to Mr. Nealis's purported risk of harm for several days each week between test results.

78.     Mr. Nealis also provided notice to the PGA Tour that its "unvaccinated persons policy" was inconsistent because it did not include protections from non-employee personnel. The PGA Tour was aware that visitors, vendors, and partners had contact with PGA Tour employees but did not require proof of vaccination or negative Covid tests from non-employees before facilitating such contact. In the example of the Employee Holiday Sale, an official PGA Tour Employee event, employees were encouraged to invite family members and friends without enforcement of the "Safety Protocols" on any non-employee unvaccinated persons.

79.     After it terminated Mr. Nealis, Defendant PGA Tour revised and expanded its testing policy to allow for any medically accredited testing option.

Defendant PGA Tour Regarded Mr. Nealis as Disabled

80.     Defendant PGA Tour regarded Mr. Nealis as having a physical impairment in the form of being a Covid-19 transmitter.

81.     This impairment, in PGA Tour's view, was so significant that he was required to test for whether he was currently infected with Covid-19 on a weekly basis and was unable to work in the office without "mitigating" the purported threat of his perceived capacity to carry and transmit the virus.

82.     Other than Defendant PGA Tour's perception that Mr. Nealis was physically disabled as a Covid-19 transmitter, Mr. Nealis was fully able to carry out all of his job functions, whether in the office or at home. As the PGA Tour even noted

19

in October, Mr. Nealis was one of the employees who demonstrated the ability to work "safely" in the office and from home during the Pandemic prior to the new protocols taking effect.

The PGA Tour's Covid-19 Policies Violated Mr. Nealis's Privacy

83.     The PGA Tour at first seemed to respect its employees' medical privacy concerns. On May 20, 2021, the PGA Tour stated that vaccination status was "a matter of personal privacy and should not be shared with managers or co-workers." Later, on October 26, 2021, the PGA Tour communicated in an email that unvaccinated individuals were <u>required</u> to submit their medical information to a digital database while vaccinated individuals were permitted to merely share their vaccination card in confidence via virtual conference. On November 9, 2021, the PGA Tour informed the unvaccinated that test results had to be emailed to a single, appointed HR representative, which would still have entailed an electronic recording of private medical information, possibly to unknown third parties. Mr. Nealis did not know whether such an email would also be ultimately recorded in the database.

84.     Mr. Nealis made it known on multiple occasions to the PGA Tour that he was willing to test in a manner that would protect the confidentiality of his medical information; however, the PGA Tour repeatedly refused Mr. Nealis' request for confidential protection of his medical information. Even up to the day before his termination, the PGA Tour stated that it could not make any concessions to ensure medical privacy because it instead had to "ensure [that] consistent protocol [were] followed for all TOUR employees who [were] required to test weekly."

Defendant PGA Tour Terminated Mr. Nealis

85.     On November 12, 2021, Mr. Nealis was terminated, despite working for Defendant PGA Tour in a position that he had been conducting virtually and could have conducted at the office but for Defendant PGA Tour's perception of his disability and Defendant PGA Tour's misplaced faith that the vaccine would prevent infection and transmission.

86.     Defendant PGA Tour was one employee closer to accomplishing its implied goal of having 100% of its employees vaccinated.

87.     Defendant terminated Mr. Nealis because of his refusal to violate his personally-held religious beliefs by getting the Covid-19 vaccine and submitting to invasive tests, in retaliation for Mr. Nealis's request for religious accommodation, because it wanted to send a message to other "non-compliant" employees, and because Defendant PGA Tour regarding Mr. Nealis as being disabled.

88.     On August 31, 2021, the PGA Tour had specifically stated that "any employee not fully vaccinated would be required to comply with the new safety protocols, regardless of whether a medical or religious exemption has been granted." To the best of Mr. Nealis's knowledge, Defendant PGA Tour did not grant any employee's request for religious exemption from the Covid-19 protocols or to continue working at home.

89.     Defendant PGA Tour treated vaccinated employees more favorably and with little or no restrictions. Vaccinated employees were permitted to attend the annual employee holiday shopping event in November 2021; unvaccinated employees who

were not in compliance with the incremental health and safety protocols were not permitted to attend. The vaccinated employees were permitted to bring guests, vaccinated or not.

90.     Defendant PGA Tour blindly (and selectively) followed the CDC's guidance even after the PGA Tour had reason to believe that the guidance should not be relied upon as "conclusive science." On July 27, 2021, prior to the implementation of Defendant PGA Tour's "Safety Protocols," the CDC changed its guidelines, citing data that demonstrated the Delta variant was affecting vaccinated and unvaccinated people similarly in regards to virus transmission. This was the same variant the PGA Tour referenced in the mid-2021 to attempt to compel its unvaccinated employees into compliance. Nevertheless, when the PGA Tour implemented its "Safety Protocols," it ignored what it should have learned from experience – that the CDC's "science" was in constant flux. The PGA Tour continued to rely on the CDC's initial reports on new variants to justify baseless restrictions and requirements on Mr. Nealis and the other unvaccinated employees while imposing none on the vaccinated employees. The PGA Tour had no proof – or reason to rely on the CDC if it said otherwise – that the risk of transmission of subsequent variants was anything but the same (regardless of vaccination status), yet Defendant PGA Tour did not require vaccinated employees to test or mask.

91.     PGA Tour's zero-restrictions policy on vaccinated individuals did not even restrict COVID-positive employees from working on-site. The PGA Tour had no

protocol to identify COVID-positive vaccinated employees, nor were vaccinated employees required to submit test results if they knew they were COVID positive.

92.     In addition, one employee requested a religious exemption and to be permitted to work from home, which was denied. Only a week or so later, the same employee requested a medical exemption and to work from home, which was approved. Allowing this employee exemption from masking and testing directly violated the PGA Tour's August 31, 2021, policy that medically and religiously exempt employees would be required to follow the same protocols.

93.     Favoring medical exemption over religious exemption is religious discrimination; permitting a medically exempt employee to continue working from home suggests that the PGA Tour would not have suffered an undue hardship if Mr. Nealis had been permitted to continue performing his job virtually.

94.     The work-from-home accommodation was communicated to the medically exempt employee on November 6, 2021, on the same day and shortly before Mr. Nealis was informed that OSHA regulations stood in the way of the PGA Tour being able to accommodate him. After Mr. Nealis pointed out that the OSHA regulations were currently under federal judicial review, the PGA Tour's legal counsel confirmed that the PGA Tour would stand by their policy even if the OSHA regulations were struck down, using the fact that the regulations even existed as proof of their "reasonableness," which, of course, was not the same thing as saying they were not religiously discriminatory.

95.    In addition to the medically exempt employee who was permitted to work from home, Mr. Nealis has reason to believe that a vaccinated member of his team was permitted to work from home due to fears that a family member was immunocompromised and at high-risk of infection.

96.    Because the PGA Tour had promoted the goals of diversity and inclusivity and (at least on the surface) took pride in its supportive community, Mr. Nealis was all the more surprised that his views, beliefs, background, and religion were not respected and were instead demeaned and degraded by the PGA Tour's communications and actions.

97.    After fourteen years of exceptional service to the PGA Tour, the Tour rushed to push a severance package to Mr. Nealis only eight business days into accommodations negotiations. Only thirteen business days passed between the date his "religious exemption" was approved and the date he was terminated. The PGA Tour's rush to terminate came in spite of the fact that its Safety Protocols had not even been fully finalized; the Tour provided a significant adjustment to its policies ten days after Mr. Nealis was terminated. Lastly, the protocols, as demonstrated by the Defendant, including in their coercive written communications, were not "required" to take effect until the OSHA regulations were scheduled to take effect on January 1, 2022.

98.    Upon termination by Defendant PGA Tour, Mr. Nealis lost his income and benefits.

99.     Mr. Nealis has retained the undersigned counsel to represent him in this litigation and has agreed to pay a reasonable fee for the firm's services. Defendant should be made to pay said fees under the applicable laws referenced above.

Count I: Religious Discrimination (Disparate Treatment) in Violation of Title VII

100.    Plaintiff Patrick Nealis restates and re-alleges the allegations of paragraphs 1 through 78 and 82 through 99 above.

101.    Defendant PGA Tour is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

102.    Mr. Nealis is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

103.    Under Title VII, it is an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1).

104.    "Religion" is defined as including "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

105.    The Equal Employment Opportunity Commission defines "religious practices" to "include all moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. § 1605.1.

106.    "[R]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated." EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 774-75 (2015).

107.    Defendant PGA Tour violated Title VII when it terminated Mr. Nealis because of his sincerely held religious beliefs and failed to provide him a reasonable religious accommodation.

108.    Mr. Nealis has a sincerely held religious belief that prevented him from receiving the Covid-19 vaccine or submitting to invasive testing. Mr. Nealis's beliefs arise under Christianity.

109.    Mr. Nealis was an outstanding employee who loved his job with PGA Tour.

110.    Pursuant to Defendant PGA Tour's Vaccine Policies, compliance with its Covid-19 protocols was a condition of his continued employment.

111.    Mr. Nealis informed Defendant PGA Tour of his belief and requested that he be permitted to continue his job responsibilities without having to follow the burdensome Covid-19 protocols. Mr. Nealis requested alternatively that he be permitted to continue working from home, which he had successfully been doing for eighteen months, or that he could have a weekly confidential instant-response saliva screening upon entering the office instead of disclosing his weekly Covid test results to unknown recipients.

112.    Any health and safety concerns regarding Mr. Nealis continuing in his duties as an unvaccinated person were at best hypothetical and unfounded.

113.    Defendant PGA Tour could have simply granted Mr. Nealis's request for religious accommodation, especially because he had successfully performed his work

virtually during the pandemic; however, Defendant PGA Tour refused Mr. Nealis's request for accommodation.

114.   Defendant PGA Tour's purported accommodations – including voluntary separation – were designed to force Mr. Nealis (and any other religious exemption seekers) out. Thus, they were not accommodations at all. In addition, and inconsistently with the employee handbook, the PGA Tour threatened on more than one occasion Mr. Nealis with "Involuntary Resignation" when it became clear Mr. Nealis was not going to violate his religious beliefs or resign voluntarily.

115.   In contrast, Defendant PGA Tour granted employees' accommodation requests that were not based on religion, including permitting at least one medically exempt employee to continue working at home.

116.   Granting accommodations for non-religious reasons and denying accommodations for religious reasons constitutes religious discrimination in violation of Title VII.

117.   Title VII demands more than "mere neutrality with regard to religious practices," requiring instead "favored treatment, affirmatively obligating employers not to 'fail or refuse to hire or discharge any individual . . . because of such individual's religious observance and practice.' " Abercrombie, 575 U.S. at 775.

118.   Employers are affirmatively required to "reasonably accommodate" an employee's religious beliefs, observances, and practices unless the accommodation would pose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

119.    Despite the utter lack of an undue hardship on Defendant PGA Tour to accommodate the request for religious exemption, Mr. Nealis was terminated after he refused Defendant PGA Tour's efforts to compel him to get the Covid-19 vaccine by imposing shifting and burdensome testing and masking requirements.

120.    If Mr. Nealis had set aside his religious beliefs and taken the Covid-19 vaccine, Defendant PGA Tour would not have fired Mr. Nealis. Thus, religion was a but-for cause of his termination.

121.    In the alternative, religion was a motivating factor in Mr. Nealis's termination.

122.    Mr. Nealis's termination was in violation of Title VII of the Civil Rights Act, which prohibits discrimination on the basis of religion. § 2000e-2. The Act further requires covered employers to provide reasonable accommodation to an employee's sincerely held religious beliefs. § 2000e(j).

123.    Title VII prohibits Defendant PGA Tour from scrutinizing what Defendant believes to be the sincerity of Mr. Nealis's religious belief.

124.    Title VII also prohibits Defendant PGA Tour from scrutinizing whether Mr. Nealis's exercise of his beliefs is logical or as consistent as Defendant PGA Tour believes they should be.

125.    Requests for reasonable accommodation must be considered based on their individual, particularized circumstances; any claim of undue hardship by the employer must be assessed on a case-by-case basis rather than through application of a blanket rule.

126.    Defendant PGA Tour applied a uniform, blanket rule in rejecting Mr. Nealis's request for accommodation.

127.    As a direct result of Defendant PGA Tour's discriminatory acts, Mr. Nealis lost his employment, income, future pension growth, and seniority; Mr. Nealis also suffered distress, embarrassment, inconvenience, invasion of privacy, and humiliation.

128.    As a direct result of Defendant PGA TOUR's discriminatory acts, Mr. Nealis' employability and reputation was damaged by the termination on his employment record as well as the inability to provide any employment references from a company which he worked exceptionally for fourteen years.

129.    Defendant has engaged in discriminatory practices with malice and reckless indifference to Mr. Nealis's federally-protected rights, thereby entitling him to punitive damages.

<u>Count II: Retaliation in Violation of Title VII</u>

130.    Plaintiff Patrick Nealis restates and re-alleges the allegations of paragraphs 1 through 78 and 82 through 99 above.

131.    Defendant PGA Tour is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

132.    Mr. Nealis is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

133.   Under Title VII, it is an unlawful employment practice for an employer "discriminate against" an employee because he "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated" in a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a).

134.   "Religion" is defined as including "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

135.   Defendant PGA Tour placed pressure on all employees to be vaccinated with the Covid-19 vaccine, including sending out company-wide emails praising the employees who had already been vaccinated and requiring a strenuous (and nonsensical) testing regime of those employees, like Mr. Nealis, who had not been vaccinated.

136.   Mr. Nealis has a sincerely held religious belief that prevented him from receiving the Covid-19 vaccine. Mr. Nealis's beliefs arise under Christianity.

137.   Mr. Nealis was an outstanding employee and valued member of his team. No complaints were ever raised about his performance until after submitting a religious exemption in October 2021.

138.   Mr. Nealis requested a religious exemption from PGA Tour's Covid-19 Policies; although his request was technically granted, PGA Tour denied his requested accommodation to continue working from home, which he had successfully been doing for eighteen months, or that he could have a weekly confidential instant-response saliva screening upon entering the office instead of disclosing his weekly Covid test results to unknown recipients.

139.   Defendant PGA Tour retaliated against Mr. Nealis for submitting the request for religious exemption from Defendant PGA Tour's Covid-19 Policies.

140.   Defendant PGA Tour violated Title VII when it set Mr. Nealis up for failure and then terminating Mr. Nealis's employment in retaliation for requesting a religious exemption.

141.   Any health and safety concerns regarding Mr. Nealis continuing to work in the office as an unvaccinated person were at best hypothetical and unfounded.

142.   Defendant PGA Tour could have simply granted Mr. Nealis's request for religious accommodation – either letting him continue working from home or permitting him to work in the office without having to comply with the burdensome weekly testing regime.

143.   Defendant PGA Tour's purported accommodation of "voluntary separation" further demonstrates the retaliatory nature of Defendant PGA Tour's adverse employment action.

144.   In contrast, Defendant PGA Tour granted employees' accommodation requests that were not based on religion, including permitting at least one unvaccinated employee with a medical exemption to continue working from home.

145.   Granting accommodations for non-religious reasons and denying accommodations for religious reasons constitutes religious discrimination in violation of Title VII and shows the retaliatory nature of Defendant PGA Tour's decision to terminate Mr. Nealis.

146.     Title VII demands more than "mere neutrality with regard to religious practices," requiring instead "favored treatment, affirmatively obligating employers not to 'fail or refuse to hire or discharge any individual . . . because of such individual's religious observance and practice.' " *Abercrombie*, 575 U.S. at 775.

147.     Employers are affirmatively required to "reasonably accommodate" an employee's religious beliefs, observances, and practices unless the accommodation would pose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

148.     Despite the lack of an undue burden on Defendant PGA Tour to accommodate the request for religious exemption, Mr. Nealis was terminated after he refused Defendant PGA Tour's efforts to force him to comply with its arbitrary Covid-19 Policies.

149.     Mr. Nealis's termination was in violation of Title VII of the Civil Rights Act, which prohibits retaliation after an employee engages in protected activity. The Act further requires covered employers to provide reasonable accommodation to an employee's sincerely held religious beliefs. § 2000e(j).

150.     Title VII prohibits Defendant PGA Tour from scrutinizing what Defendant believes to be the sincerity of Mr. Nealis's religious belief.

151.     Instead of providing the readily available and reasonable accommodation requested by Mr. Nealis, Defendant PGA Tour rejected Mr. Nealis's request and instead terminated him for submitting his religious exemption request.

152.    As a direct result of Defendant PGA Tour's retaliatory and discriminatory acts, Mr. Nealis lost his employment, income, future pension growth, and seniority; he also suffered distress, embarrassment, inconvenience, invasion of privacy, and humiliation.

153.    As a direct result of Defendant PGA TOUR's discriminatory acts, Mr. Nealis' employability and reputation was damaged by the termination on his employment record as well as the inability to provide any employment references from a company which he worked exceptionally for fourteen years.

154.    Defendant has engaged in retaliatory practices with malice and reckless indifference to Mr. Nealis's federally-protected rights, thereby entitling him to punitive damages.

Count III: Perceived Disability Disparate Treatment in Violation of the ADA

155.    Plaintiff Patrick Nealis restates and re-alleges the allegations of paragraphs 1 through 99 above.

156.    This is an action against Defendant PGA Tour for violation of the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 105 Stat. 328 (1990); and as amended, ADA Amendments Act of 2008, 42 U.S.C. § 12101, et. seq.

157.    At all times relevant to this action, Mr. Nealis was a qualified individual with a perceived disability within the meaning of the ADA. 42 U.S.C. § 12102(3).

158.    Mr. Nealis was regarded as or was perceived as being disabled by Defendant PGA Tour, which considered him, as a person refusing the vaccine on religious grounds, to have or be a transmitter of Covid-19.

33

159.    Defendant regarded Mr.Nealis as having Covid-19 as evidenced by its conditioning his continued employment on the overbearing and onerous testing regime it required him to follow.

160.    This perception of Mr. Nealis existed presently and was not merely one of fear that he may catch Covid-19 in the future. Rather, Mr. Nealis was regarded as being presently infectious or otherwise able to infect others with the Covid-19 virus. As a result, he was subjected to a regime that Defendant had no doubt he would be unable to comply with and thereby be subject to termination.

161.    Defendant is prohibited under the ADA from discriminating against Plaintiff because of Plaintiff's disability with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

162.    Defendant PGA Tour violated the ADA by unlawfully terminating and discriminating against Mr. Nealis based on his perceived disability.

163.    Defendant PGA Tour intentionally discriminated against Mr. Nealis on the basis of his perceived disability.

164.    As a direct and proximate result of Defendant PGA Tour's unlawful and discriminatory conduct in violation of the ADA, Mr. Nealis has suffered and continues to suffer lost wages, pension growth, employability and seniority, as well as severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Mr. Nealis is entitled to an award of monetary damages and other relief.

34

165.    Defendant PGA Tour's unlawful conduct in violation of the ADA is outrageous and malicious, intended to injure Mr. Nealis, and has been done with conscious disregard of Mr. Nealis's civil rights, entitling him to an award of exemplary and/ or punitive damages.

<u>Count IV: Religious Discrimination in Violation of the FCRA</u>

166.    Plaintiff Patrick Nealis restates and re-alleges the allegations of paragraphs 1 through 78 and 82 through 99 above.

167.    This is an action against Defendant PGA Tour pursuant to the Florida Civil Rights Act of 1992 ("FCRA"), Section 760.01, et seq., Florida Statutes.

168.    Defendant, PGA Tour, discriminated against Mr. Nealis with regard to the term, conditions, and privileges of his employment because of Mr. Nealis's religion, in violation of Section 760.01, et seq. Florida Statutes.

169.    Despite Mr. Nealis having successfully carried out his job duties remotely during the first eighteen months of the pandemic, Defendant PGA Tour pushed Mr. Nealis out after he requested a religious accommodation and refused to get vaccinated because of his religious beliefs.

170.    Defendant PGA Tour granted an accommodation to at least one unvaccinated employee with a medical exemption by allowing that employee to continue working from home.

171.    Defendant PGA Tour's urging Mr. Nealis to take the vaccine against his religious beliefs, implying that he was being reckless and socially irresponsible, requiring him to disclose his vaccine status, and forcing him to endure a harsh regime

of Covid-19 testing after he refused to take the vaccine demonstrates that Defendant's actions were willful and malicious.

172.    As a direct result of Defendant PGA Tour's discriminatory acts, Mr. Nealis lost his employment, income, future pension growth, and seniority; he also suffered distress, embarrassment, inconvenience, invasion of privacy, and humiliation.

173.    As a direct result of Defendant PGA TOUR's discriminatory acts, Mr. Nealis' employability and reputation was damaged by the termination on his employment record as well as the inability to provide any employment references from a company which he worked exceptionally for fourteen years.

174.    Defendant has engaged in discriminatory practices with malice and reckless indifference to Mr. Nealis's rights under the FCRA, thereby entitling him to punitive damages.

<u>Count V: Retaliation in Violation of the FCRA</u>

175.    Plaintiff Patrick Nealis restates and re-alleges the allegations of paragraphs 1 through 78 and 82 through 99 above.

176.    This is an action against Defendant PGA Tour pursuant to the Florida Civil Rights Act of 1992 ("FCRA"), Section 760.01, *et seq.*, Florida Statutes.

177.    Defendant PGA Tour retaliated against Mr. Nealis with regard to the term, conditions, and privileges of his employment because of Mr. Nealis's protected activity related to his religious beliefs

178.    Mr. Nealis provided a written request to Defendant PGA Tour stating his religious beliefs against the vaccine and requesting to be able to work from home

36

or to not be subject to Defendant's oppressive Covid-19 policies.

179.    Despite Mr. Nealis having successfully carried out his job duties remotely during the first eighteen months of the pandemic, Defendant PGA Tour denied Mr. Nealis's request to work from home and required Mr. Nealis to comply with burdensome requirements.

180.    Defendant PGA Tour's urging Mr. Nealis to take the vaccine against his religious beliefs, questioning the consistency of his religious beliefs, and imposing pointless requirements after he refused to take the vaccine demonstrate that Defendant's actions were retaliatory, willful, and malicious.

181.    As a direct result of Defendant PGA Tour's retaliatory acts, Mr. Nealis lost his employment, income, seniority, and future pension growth; he suffered distress, embarrassment, inconvenience, invasion of privacy, and humiliation.

182.    As a direct result of Defendant PGA TOUR's discriminatory acts, Mr. Nealis' employability and reputation was damaged by the termination on his employment record as well as the inability to provide any employment references from a company which he worked exceptionally for fourteen years.

183.    Defendant has engaged in retaliatory practices with malice and reckless indifference to Mr. Nealis's rights under the FCRA, thereby entitling him to punitive damages.

Count VI: Perceived Handicap Disparate Treatment in Violation of the FCRA

184.     Plaintiff Patrick Nealis restates and re-alleges the allegations of paragraphs 1 through 99 above.

185.     This is an action against Defendant PGA Tour pursuant to the Florida Civil Rights Act of 1992 ("FCRA"), Section 760.01, *et seq.*, Florida Statutes.

186.     Mr. Nealis was regarded as or was perceived as being disabled by Defendant PGA Tour, which considered him, as a person refusing the vaccine on religious grounds, to have or be a transmitter of Covid-19.

187.     Defendant regarded Mr.Nealis as having Covid-19 as evidenced by its conditioning his continued employment on the overbearing and onerous testing regime it required him to follow.

188.     This perception of Mr. Nealis existed presently and was not merely one of fear that he may catch Covid-19 in the future. Rather, Mr. Nealis was regarded as being a presently infectious or otherwise able to infect others with the Covid-19 virus. As a result, he was subjected to a regime that Defendant had no doubt he would be unable to comply with and thereby be subject to termination.

189.     Defendant is prohibited under the FCRA from discharging Plaintiff because of Plaintiff's perceived handicap. F.S. § 760.10(1).

190.     Defendant PGA Tour violated the FCRA by unlawfully terminating Mr. Nealis based on his perceived handicap.

191.     Defendant PGA Tour intentionally discriminated against Mr. Nealis on the basis of his perceived disability.

38

192.    As a direct and proximate result of Defendant PGA Tour's unlawful and discriminatory conduct in violation of the FCRA, Mr. Nealis has suffered and continues to suffer lost income, future pension growth, and seniority, irreparable harm to his employability and professional reputation, as well as severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Mr. Nealis is entitled to an award of monetary damages and other relief.

193.    Defendant PGA Tour's unlawful conduct in violation of the FCRA is outrageous and malicious, intended to injure Mr. Nealis, and has been done with conscious disregard of Mr. Nealis's civil rights, entitling him to an award of exemplary and/ or punitive damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Patrick Nealis requests that this Honorable Court:

a.  Enter judgment against Defendant PGA Tour, Inc. for back wages and back benefits found to be due and owing at the time of trial; front-pay and/ or reinstatement; compensatory damages, including emotional distress damages, in an amount to be proved at trial; punitive damages; and pre- and post-judgment interest thereon;

b.  Grant Plaintiff Patrick Nealis his costs and an award of reasonable attorneys' fees; and

c.  Award any other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff Patrick Nealis requests a trial by jury on all issues so triable.

Respectfully submitted,

<u>/ s/  Marie A. Mattox</u>
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32303
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801

Attorneys for Plaintiff Patrick Nealis

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been

furnished to all counsel of record by CM/ ECF this 23rd day of February, 2024.

<u>/ s/  Marie A. Mattox</u>
Marie A. Mattox