# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

PATRICK NEALIS,

     Plaintiff,

Case No. 3:23-cv-623-TJC-MCR

v.

PGA TOUR, INC.,

     Defendant.

_____

# **O R D E R**

This COVID-era case is before the Court on Defendant PGA Tour, Inc.'s Motion for Summary Judgment. Doc. 63. Plaintiff Patrick Nealis filed his response and PGA has replied. Docs. 65, 70. Nealis is suing PGA, his former employer, alleging his termination for violating PGA's COVID testing requirements was improper. Doc. 40. Nealis has four remaining claims against PGA: Counts I and IV allege religious discrimination in violation of Title VII and the Florida Civil Rights Act ("FCRA") respectively and Counts II and V allege retaliation in violation of Title VII and the FCRA.[1] See Doc. 44.

_____

[1] "FCRA claims are analyzed under the same framework as claims brought under Title VII . . . ." King v. HCA, 825 F. App'x 733, 736 n.2 (11th Cir. 2020). Counts III and VI were dismissed. See Doc. 44. The religious discrimination counts cover both disparate treatment and failure to accommodate theories. Doc. 63 at 4.

## I.    FACTS

Nealis started his employment with PGA in 2007. Doc. 64-17 at 9.[2] In March 2020, due to the COVID-19 pandemic, PGA required employees to work from home. Doc. 66-15 ¶26. More than a year later, in May 2021, PGA encouraged employees to return to the office on a voluntary basis, with partially vaccinated or unvaccinated employees required to mask or social distance. Doc. 66-15 ¶7; Doc. 64-17 at 402. PGA stated proof of vaccination was not required ("we trust our employees to abide by the honor system") and "[m]anagers and coworkers should not ask one another about their vaccination status as a matter of privacy." Doc. 64-17 at 402. On July 16, 2021, PGA communicated with employees that it was preparing for a full office return in September, and unvaccinated employees would need to comply with various safety protocols (including masking).[3] Doc. 64-17 at 403–04. The same email notified employees that "[f]ailure to comply is a violation of [PGA] policy and subject to disciplinary action, including termination."[4] Id.

---

[2] References are to the ECF document number, which may differ from exhibit numbers referenced by the parties. See Docs. 64, 66.

[3] The return to office was delayed several times but occurred November 1, 2021. See Doc. 66-15 ¶20.

[4] Similar language about consequences for failure to comply was part of a broad email communication on August 31, 2021, and the November 2021 PGA policy. Doc. 64-17 at 406, 411.

On August 6, 2021, PGA informed employees about "required" steps to provide their vaccination status, including reporting vaccination information by August 13, 2021. Doc. 64-17 at 405. PGA also told employees "[i]f you have not yet fully vaccinated, you will need to fill out a survey . . . stating when you intend to get the vaccine or that you do not plan to get the vaccine." Id. On August 31, 2021, PGA told employees who choose to not be vaccinated for medical or religious reasons they "must complete a COVID-19 Vaccination Request for Exemption" form by September 15, 2021. Doc. 64-17 at 407. In the same email, PGA stated "any employee not fully vaccinated will be required to comply with new safety protocols, regardless of whether a medical or religious exemption has been granted." Id.[5]

About a month after the deadline, on October 19, 2021, Nealis submitted a religious exemption request indicating his religious beliefs prevented him from taking the vaccine.[6] Doc. 66-15 ¶35. Within a week, on or before October

_____

[5] More than once, PGA uses mandatory language in its communication, such as saying people who have a medical or religious reason to not be vaccinated "must" complete an exemption request and "require[ing]" compliance with safety protocols for unvaccinated employees. Even so, the record does not indicate PGA required vaccination to stay employed, although Nealis testified he interpreted PGA's communication as a vaccine mandate and was generally concerned about the "mandatory nature" of the vaccine. Doc. 64-1 ¶8; Doc. 64-17 at 41–43, 71–74.

[6] The religious objection was because Nealis thought the vaccine could be the "mark" mentioned in Revelation, subjecting those who accepted the mark to spiritual torment. See Doc. 64-17 at 41–46, 147–48, 415. Nealis's exemption request was a few days after PGA sent an email that stated: "[w]e respect your]

26, 2021, PGA approved the exemption request. Doc. 64-17 at 421. Even with an approved exemption, Nealis and other unvaccinated employees were required to comply with safety protocols. Doc. 64-17 at 413, 418. The safety protocols had three components: (1) masking at work, (2) weekly testing, and (3) weekly reporting of test results. E.g., Doc. 64-17 at 102, 410. As PGA and Nealis communicated about Nealis's concerns, PGA extended the deadline for Nealis to comply (and report to work) at least three times. Doc. 64-17 at 201–02.

Nealis had religious and other objections to the safety protocols.[7] Even though the safety protocols were required for all unvaccinated employees and had been previously communicated, Nealis emailed PGA and characterized the safety protocols as "punitive accommodations" amounting to religious discrimination. Doc. 64-17 at 420.

---

decision to abstain from the COVID-19 vaccination. . . ." and went on to describe mandatory safety protocols that would apply for the return to office. Doc. 64-17 at 409. Nealis requested the exemption to avoid "obtaining the vaccine and being subjected to the safety protocols." Doc. 66-15 ¶ 34; Doc. 64-17 at 83. The only outcome, however, was that Nealis was not required to pay an additional insurance premium for unvaccinated employees. Id.

[7] There is evidence Nealis acted in ways contrary to his stated beliefs (such as by getting other vaccines, masking, prior use of nasal tests and reporting those COVID test results); however, Nealis testified as to why he considered those circumstances different. Doc. 64-17 at 38, 45, 47–48, 61, 107–08, 115–16. For summary judgment, the Court assumes the sincerity of Nealis's religious beliefs.

4

Nealis thought the masking requirement identified unvaccinated employees in a discriminatory manner.[8] See Doc. 64-17 at 108, 167–69, 290. PGA offered Nealis a different (more remote) workstation, to limit when he would be required to mask. Doc. 64-17 at 174–75, 438–39. Nealis declined this option citing the need to interact with his team and noting the opportunity to interact was one reason for the location of his current workstation. Doc. 64-17 at 177–78, 437–38. Nealis ultimately agreed to masking as required. Doc. 64-17 at 216–17.

Nealis objected to nasal testing based on its intrusive nature. See Doc. 64-17 at 420. Nealis considered the testing to be burdensome and was concerned about the impact of supply chain issues with required weekly testing.[9] See Doc. 64-17 at 159, 180–81. PGA offered saliva testing as an alternative, and Nealis ultimately agreed to the saliva testing. Doc. 64-17 at 114, 157, 420.

PGA and Nealis did not reach an agreement about reporting test results. Doc. 64-17 at 200-01, 217. The initial requirement was to report test results

---

[8] Nealis testified his objections to safety protocols also were tied to his religious beliefs, but admitted he did not tell PGA he had a religious objection to the masking requirement. See Doc. 64-17 at 113–14, 132–35. Because Nealis ultimately agreed to the masking requirement and was offered an acceptable testing alternative, the discussion about the masking and testing protocols and Nealis's objections to those protocols is limited. See Doc. 64-17 at 114, 216–17.

[9] To address this and other concerns, PGA offered to fully pay for testing and have test materials delivered to Nealis's home. Doc. 64-17 at 186, 208.

through an app. <u>See</u> Doc. 64-17 at 181, 189, 410, 439. Nealis expressed concerns about confidentiality, requested to report his results to a designated individual, and requested the results not be recorded or shared in any manner.[10] Doc. 64-17 at 181–83, 189–91, 427–40. PGA offered an internal email (covid@pgatourhq.com) for Nealis to use to report results. Doc. 64-17 at 188. Nealis continued to object, stating (by email):

> [D]isclosing my personal medical information is a significant concern to me. I am willing to disclose in confidentiality the results of my test to a trusted point of contact; however . . . I do not want my personal medical information stored, communicated or distributed.[11]

Doc. 64-17 at 436. PGA reassured Nealis test results would not be shared with others in the company and the information would be stored separately from personnel files. <u>Id.</u> at 432. Nealis's communication consistently expressed concern over privacy or confidentiality related to reporting testing results. <u>See</u> Doc. 64-17 at 161, 164, 181–83, 194, 200–01, 217.

---

[10] Nealis characterized changes to requirements involving reporting and sharing vaccination status information as "abandonment" of the prior honor system, and a "contradiction to the commitment to confidentiality of personal privacy [PGA] has previously promised . . . ." Doc. 66-15 ¶25; Doc. 65 at 4.

[11] In another part of the same email chain, Nealis stated: "I do not feel comfortable posting my personal medical information on an app interface which is distributed to third parties outside of my control, including the recording and reporting of my medical information without my consent . . . ." Doc. 64-17 at 438. At his deposition, Nealis expressed concern that storing the results would allow someone like an "IT administrator" to have access to his medical records without a justifiable reason. Doc. 64-17 at 188.

After they had been communicating about the protocols for almost two weeks, Nealis told PGA the concern about reporting test results (the only safety protocol not resolved) was related to his religious beliefs. Doc. 64-17 at 432 (stating in an email the "communicated objection to the recording of my personal and medical information is directly related to my original ([PGA] approved) religious exemption" request). In light of Nealis's prior focus on privacy, and because Nealis did not offer more explanation about why the reporting requirement conflicted with his religious beliefs, PGA did not consider this a "bona fide religious objection to the recording of his test results." Doc. 64-1 ¶18; Doc. 63 at 12. In addition, PGA deemed the request to report to an individual without being able to record or share the results to be unreasonable and inconsistent with the need to "conduct contact tracing, track quarantine periods, and comply with potential imminent federal OSHA requirements." Doc. 64-1 ¶¶16–17; see Doc. 63 at 7 n.3. Nealis then again requested to work full-time from home. Doc. 64-17 at 51, 215, 427–28. PGA denied this request. Id.[12] Doc. 64-17 at 51, 215, 427–28.

Nealis's last position with PGA was as a Senior Manager Business Intelligence for the Data and Technology Science Team. Doc. 66-15 ¶5. The

---

[12] PGA did offer for Nealis to work two days a week from home but compliance with safety protocols was still required. Doc. 64-17 at 427.

team was led by Mike Vitti, and Nealis's supervisor was Jennifer Vermeulen. Id. Nealis did not have any responsibility to manage or supervise others. Id.

Nealis identified three coworkers treated more favorably because they were allowed to work from home: Maria Kellerman, Amberlee Buckley, and Josh Oskwarek.[13] Doc. 64-17 at 243–45. Kellerman worked on a different team. Doc. 64-2 ¶9. Kellerman's request to work from home for religious reasons was denied, but a few days later she was allowed to work from home for medical reasons. Doc. 64-17 at 248–50. Nealis does not know Kellerman's medical circumstances. See Doc. 64-17 at 250–51. Buckley, who worked on a different team, was allowed to work from home for medical reasons. Doc. 64-17 at 254–55; Doc. 64-2 ¶10. Oskwarek, who worked on the same team, was allowed to work from home because of a severely immunocompromised family member.[14] Doc. 64-17 at 245–47; Doc. 64-2 ¶11. No alleged comparator held the same position as Nealis or had the same supervisor. Doc. 64-2 ¶¶9–11. PGA determined on-site collaboration was not required for Kellerman, Buckley, or

---

[13] Nealis argued there was a fourth individual, whose name and circumstances were unknown. Doc. 64-17 at 243–45, 257–58. Kellerman and Buckley were unvaccinated and Oskwarek was vaccinated. See Doc. 64-2 ¶¶9–11.

[14] Per PGA, Oskwarek worked on a different team. Doc. 64-2 ¶11. For summary judgment purposes, the Court accepts Nealis's characterization.

Oskwarek, but Nealis's position did require on-site collaboration. Doc. 64-2 ¶¶9–11; Doc. 64-3 ¶9.

Nealis argued the required safety protocols for unvaccinated employees discriminated against employees who were unvaccinated, for any reason, and gave preferable treatment to vaccinated employees.[15] Doc. 64-17 at 29, 82, 88, 102, 239, 243. Doc. 64-17 at 420. Nealis told PGA he was concerned about the "undue burden these currently stated additional protocols place on me as an unvaccinated individual." Doc. 64-17 at 420. Nealis thought PGA "was giving preference to the 'fears' of vaccinated employees regarding getting COVID-19 over the 'fears' of religious employees regarding violating their religious beliefs." Doc. 66-15 ¶55.

Nealis did not comply with the required reporting of test results and was terminated from employment on November 12, 2021. Doc. 64-17 at 216.

## II.   ANALYSIS

### A.   Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[15] As support, Nealis cites (1) PGA's positive comments about employees who had been vaccinated, and (2) Vitti's concern for a family member in the hospital without access to support "because of unvaccinated individuals." Doc 66-15 ¶¶16-18; Doc. 64-17 at 228–30. Vitti's family member passed away.

Further, the Court will construe evidence in the light most favorable to the non-moving party. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

### B. Religious Discrimination (Counts I and IV)

#### 1. Alleged Disparate Treatment

A disparate treatment claim based on circumstantial evidence is analyzed under the McDonnell Douglas burden shifting framework or Nealis may establish a convincing mosaic of evidence to support discrimination. [16] McCreight v. AuburnBank, 117 F.4th 1322, 1334 (11th Cir. 2024) (noting "the McDonnell Douglas framework and the 'convincing mosaic standard' are two ways to approach the same question: whether the plaintiff has put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred."). Under McDonnell Douglas, Nealis can establish a prima facie case of religious discrimination by showing: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly-situated individual outside his protected class." Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). "If the plaintiff

---

[16] Both parties cite standards for circumstantial evidence claims.

makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted).

To establish pretext, the plaintiff must show "the proffered reason was not the true reason for the employment decision . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). The evidence for pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (cleaned up).

Using the McDonnell Douglas framework, the only dispute is about the fourth prong: whether Nealis identified a proper comparator. The Eleventh Circuit requires a comparator be "similarly situated in all material respects." Lewis v. City of Union City, Ga., 934 F.3d 1169, 1178 (11th Cir. 2019). Nealis identified three comparators. Two, Kellerman and Buckley, worked on different

teams, with different supervisors, and in different positions. Doc. 64-2 ¶¶9, 10. Oskwarek worked on the same team, but under a different supervisor, and in a different role. Doc. 64-2 ¶11. For the three alleged comparators, PGA granted a work from home request for medical reasons and after determining on-site collaboration was not necessary for their roles. Id. ¶¶9–11.

In contrast, PGA determined on-site collaboration was necessary for Nealis's position. Nealis does not directly dispute this, but he does argue that he was able to work effectively as a remote employee. Doc. 64-17 at 428. Nealis's ability to work effectively while the employee workforce was generally remote for safety reasons during the pandemic, does not refute PGA's determination that on-site collaboration for his role was critical as employees were able to return to the office. See Doc. 63 at 33 n.22; Reno v. Holifield, 115 F.3d 1555, 1565 (11th Cir. 1997) (collecting cases noting the inquiry into pretext focuses on employer belief, not the employee's self-assessment) (abrogated on other grounds by Lewis v. City of Union City, Ga., 918 F.3d 1213, 1218 (11th Cir. 2019)). Indeed, Nealis's own testimony and action supports PGA's conclusion that on-site collaboration was critical to his role. Nealis himself refused the offer of a more remote workstation, citing the importance of interacting with colleagues and that his current workstation was chosen because it fostered such interaction.

Nealis cannot establish a prima facie case because he lacks a proper

comparator. Having similarly situated comparators helps courts "avoid 'second-guessing employers' reasonable decisions and confusing apples with oranges.'" See Humphrey v. Napolitano, 517 F. App'x 705, 709 (11th Cir. 2013) (quoting Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006)).[17]

Nealis essentially argues his request to work from home for religious reasons was treated differently than comparable requests to work from home for medical reasons. In support, he cites the fact that Kellerman's request to work remotely was denied for a religious reason, but it was granted few days later for a medical reason. While the reason for the change with Kellerman's request is not clear, it is undisputed that on-site collaboration was critical to Nealis's role and PGA determined it was not critical for Kellerman's role or the other alleged comparators.[18]

Nor has Nealis presented a "convincing mosaic" of evidence of being treated differently based on his religious views. Nealis repeatedly testified he

---

[17] The Court does not rely on unpublished opinions as binding precedent, however, they may be cited when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022).

[18] There is no evidence as to why Kellerman's religious request to work from home was denied but then granted for a medical reason, and the Court will not speculate as to whether there was a legally sufficient distinction. Each alleged comparator was permitted to work from home for a medical reason after PGA determined on-site collaboration was not required. These circumstances distinguish them from Nealis's situation.

thought all unvaccinated employees (regardless of why they were unvaccinated) were treated differently because they had to comply with PGA's safety protocols, while vaccinated employees were treated better because they were not subject to the safety protocols. Vaccination status alone, however, is not a protected characteristic. Accordingly, Nealis has not established a prima facie case of disparate treatment based on religion.

Even if Nealis had established a prima facie case, his claims of religious discrimination fail because he cannot show the reason for his termination was pretextual. In multiple communications, PGA told employees that failure to comply with safety protocols could result in termination. This is what happened to Nealis—he was terminated because he did not comply with safety protocols.[19]

### 2. Alleged Failure to Accommodate

For a failure to accommodate claim based on "circumstantial evidence, '[a] Title VII plaintiff must first establish a prima facie case of religious discrimination by 'present[ing] evidence sufficient to prove that (1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for failing to comply with the conflicting employment requirement.' " Jean-Pierre v. Naples Cmty. Hosp., Inc., 817 F. App'x 822, 826 (11th Cir. 2020) (quoting Morrissette-

---

[19] Apart from the alleged comparators, discussed supra, there is no evidence about others who failed to comply with safety protocols.

Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1321 (11th Cir. 2007) (citations omitted). "If the plaintiff establishes a prima facie case, 'the burden shifts to the defendant to 'demonstrate[ ] that he is unable to reasonably accommodate [] an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.'" Id. (quoting 42 U.S.C. § 2000e(j)).

Nealis initially objected to all the safety protocols, but he and PGA reached agreement about masking and use of a saliva-based test, leaving only a dispute about reporting of test results.[20] PGA offered Nealis an alternative

---

[20] Although the parties did not focus on them, there are cases discussing employment disputes about COVID vaccine mandates or safety protocols. E.g., Schmidt v. Disney Parks, Experiences, and Products, Inc., et al., 721 F. Supp. 3d 1314 (M.D. Fla. 2024). Even so, the Court did not find cases similar enough to be persuasive. Three recent appellate decisions reversed dismissal, generally concluding the employee expressed a religious objection sufficient to defeat the motion to dismiss. See Passarella v. Aspirus, Inc., 108 F.4th 1005 (7th Cir. 2024) (reversing dismissal because employees sought accommodation from vaccine mandate due to plausible religious beliefs); Ringhoffer v. Mayo Clinic, Ambulance, 102 F.4th 894 (8th Cir. 2024) (reversing dismissal because employees plausibly pled their religious beliefs conflicted with testing requirement); Prida v. Option Care Enters., Inc., No. 23-3936, 2025 WL 460206 (6th Cir. Feb. 11, 2025) (reversing dismissal because employee consistently communicated refusal to take weekly COVID tests was based on religious beliefs). Besides being factually distinguishable, these cases address the standard for dismissal for failure to state a claim which is materially different than the summary judgment inquiry on a full record. Other cases the Court identified involved religious objections to a vaccine mandate, religious objections to another safety protocol, or non-religious objections to an employer requirement, whereas the dispute between Nealis and PGA was ultimately limited to a religious objection to the reporting of test results. See also Oberst v. Cnty. of Lane, No. 6:23-CV-01556, 2025 WL 318712 (D. Or. Jan. 28, 2025)

reporting mechanism (an internal email instead of external app) and some assurances about confidentiality. The alternative did not meet Nealis's condition of reporting to an individual without his test results being recorded, stored, or shared in any way.[21] PGA extended the deadline for Nealis to report test results three times. PGA informed Nealis he would be terminated if he did not report test results by noon on November 12, 2021, and that is what happened.

Nealis filed his request for religious exemption on October 19, 2021, and it was approved one week later. However, the approval only meant Nealis did not have to pay an additional insurance premium applicable to unvaccinated employees. Even with an approved religious exemption, Nealis was still required to comply with safety protocols to which he objected. Starting at least by October 27, 2021, Nealis and PGA had multiple communications about his

_____

(granting summary judgment for employer and finding that employer provided accommodations for employee's religious objections to vaccine requirement, but employee only expressed "secular" objections to masking and testing requirements).

[21] PGA argues Nealis's accommodation claim fails because Nealis is not entitled to his preferred accommodation. Doc. 63 at 23 (citing Patterson v. Walgreen Co., 727 F. App'x 581, 585 (11th Cir. 2018)). The Patterson court also noted the Supreme Court had determined "a reasonable accommodation is one that eliminates the conflict between employment requirements and religious practices." Id. at 586 (quoting Ansonia Bd. of Educ., v. Philbrook, 479 U.S. 60, 70 (1986)). Although PGA offered Nealis alternatives, none of them fully addressed Nealis's concern that having test results recorded and possibly shared might leave him "marked."

16

objections to the safety protocols and alternatives. Related to reporting the test results, Nealis's communication focused on privacy and confidentiality concerns – not a conflict with his religious beliefs. Nealis repeatedly stated his concerns about having test results recorded or shared in any manner, often expressing that if the results were recorded, they could be shared in ways he did not approve.

Then, on November 8, 2021, Nealis mentioned his privacy concerns were "directly related" to his religious exemption request (and in turn, related to his interpretation of Biblical prophecy). Other than saying the privacy concern was related to his religious exemption (and referring to his notes about that broader discussion), Nealis did not offer details as to how reporting the test results to an internal email with limited sharing would conflict with his religious beliefs. The overall context of the communication raises doubts whether Nealis had a bona fide religious objection to reporting test results, but for summary judgment, the Court will presume he did.

Because PGA's offered accommodation of reporting to an internal email did not resolve Nealis's stated religious conflict, Nealis has established a prima facie case and PGA must show the requested accommodation was an undue hardship to rebut the prima facie case. Nealis suggested two alternatives. One was to report his test results to an individual but not allow any recording or sharing of the results. In late 2021, many workplaces, including PGA, were

17

trying to navigate the evolving circumstances related to the COVID-19 pandemic, including minimizing or managing exposure concerns for employees and complying with developing and changing government requirements. The request to test and report results weekly was common and exposure sometimes resulted in contact tracing. OSHA guidance for its Emergency Temporary Standard told employers that recording test results would be required.[22] Given this, it would have been an undue hardship as a matter of law (not to mention as a matter of common sense) to allow the weekly reporting but prohibit PGA from any recording or sharing of test results—under any circumstances. The second option was to work remotely. The work from home option would have been an undue hardship for Nealis's position because it is undisputed that it required on-site collaboration.

Accordingly, PGA is entitled to summary judgment on Nealis's religious discrimination claims, both disparate treatment and failure to accommodate.

_____

[22] The Court takes judicial notice that OSHA's November 2021 FAQ, Question 6.F. for the Emergency Temporary Standard required covered employers to record test results of unvaccinated employees. COVID-19 Vaccination and Testing ETS - Frequently Asked Questions | Occupational Safety and Health Administration (last visited February 28, 2025). The OSHA ETS guidance was published November 5, 2021. The Fifth Circuit quickly entered a stay of the OSHA rule, and the stay was lifted by the Sixth Circuit after cases were consolidated. See Nat'l Fed'n of Indep. Bus. v. OSHA, 595 U.S. 109 (2022). The rule was stayed by the Supreme Court on January 13, 2022, and later withdrawn. Id.; see Doc. 63 at 7 n.3.

**C.      Retaliation (Counts II and V)**

Nealis also claims his termination was retaliatory. A plaintiff may establish a prima facie case of retaliation by showing: (1) he engaged in statutorily protected activity, (2) he was adversely affected by an employment decision, and (3) there was a causal connection between the statutorily protected conduct and the adverse employment action. Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006). There is no dispute Nealis engaged in protected activity by requesting a religious exemption and no dispute his termination was an adverse employment action. Nealis also raised concerns of religious discrimination to PGA by email.

The dispute is whether there is a causal connection between his protected activity and termination. One way to establish a causal connection is based on temporal proximity–when the adverse action occurs shortly after the protected activity, it supports a conclusion the two are causally connected. Grant v. Miami-Dade Cnty. Water & Sewer Dep't, 636 F. App'x 462, 468–69 (11th Cir. 2015) (citing Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)). Here, Nealis's termination was less than a month after his request for a religious accommodation and only a few weeks after he mentioned discrimination.

But in this case, the evidence of connection based on temporal proximity is rebutted because the consequences of not following safety protocols were announced before Nealis engaged in protected activity. As early as July 16,

2021, at least three months before Nealis submitted his request for religious exemption, PGA told employees they could be terminated for not following safety protocols. Nealis was terminated for not posting his test results by the extended deadline.

Courts have held an adverse action <u>before</u> protected activity is not causally connected as a matter of law. <u>Debe v. State Farm Auto. Mut. Ins. Co.</u>, 860 F. App'x 637, 641 (11th Cir. 2021) ("[I]f the alleged retaliatory conduct occurred <u>before</u> the employee engaged in protected activity, the two events cannot be causally connected."). The same logic applies here because although the adverse action occurred after the protected activity, the consequence of termination was contemplated and communicated well before the protected activity. <u>See</u> <u>Gonzalez v. City of New York</u>, No. 22-cv-3577, 2024 WL 1332546 at *14 (W.D.N.Y. March 28, 2024) (collecting cases which hold enforcement of a previously communicated policy is not retaliation). Months before Nealis engaged in protected activity, PGA decided (and communicated) that unvaccinated employees who did not follow required safety protocols could be terminated. Doc. 66-15 ¶24. The decision to terminate Nealis was because he did not comply with the requirement to report his testing results. PGA's insistence that employees comply with safety protocols was the same before and after Nealis's protected activity, and therefore his termination was not causally connected to his protected activity or religious objection. <u>See</u> <u>Edgerton v. City</u>

of Plantation, 682 Fed. App'x 748, 750–51 (11th Cir. 2017) (noting activities that occurred both before and after protected activity, lack a causal connection to the protected activity).

PGA is entitled to summary judgment on Nealis's retaliation claims.

Accordingly, it is hereby

**ORDERED:**

1.     Defendant PGA Tour, Inc.'s Motion for Summary Judgment, Doc. 63, is **GRANTED**.

2.     The Clerk is directed to enter judgment in favor of PGA Tour, Inc., and against Patrick Nealis and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, the 13th day of March, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:
Counsel of record